UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STARNEATRICE KIRKSEY,
o/b/o S.C.W.,

                Plaintiff,          Civil Action No. 12-14194
                                         Honorable Gershwin A. Drain
                                         Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 16]

Starneatrice Melisa Kirksey brings this action on behalf of her minor son, S.C.W. ("Plaintiff"),[1] pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 16], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.  RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the Act is supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Plaintiff's Motion for Summary Judgment [14] be DENIED, and

----

[1] For convenience, the Court will refer to S.C.W., the minor child, as "Plaintiff" throughout this brief, although his mother, Starneatrice Kirksey, is the named plaintiff in this action.

that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.   REPORT

### A.   Procedural History

On June 5, 2008, an application for SSI was filed on behalf of Plaintiff, alleging a disability onset date of April 5, 2008.  (Tr. 148-54).  This application was denied initially on September 3, 2008.  (Tr. 54-57).  A timely request for an administrative hearing was filed on Plaintiff's behalf, and a hearing was held on November 17, 2010, before ALJ John Rabaut.[2]  (Tr. 35-52).  Both Plaintiff and his mother appeared at the hearing, represented by attorney James Carlin, and Plaintiff's mother testified.  (*Id.*).  On January 3, 2011, the ALJ issued a written decision finding that Plaintiff is not disabled.  (Tr. 17-29).  On May 15, 2012, the Appeals Council denied review.  (Tr. 4-7).  On behalf of Plaintiff, Ms. Kirksey timely filed for judicial review of the final decision on September 20, 2012.[3]  (Doc. #1).

### B.   Background

#### 1.   *Disability Reports*

Plaintiff was born on April 5, 2008, making him two months old at the time his application for disability benefits was filed.  (Tr. 175-77).  In a disability report dated June 5, 2008, Ms. Kirksey reported that Plaintiff suffers from several heart defects and has been disabled

---

[2] Perplexingly, the record contains an April 12, 2010 letter from Plaintiff's attorney to the Social Security Administration, in which it is indicated that Plaintiff "was awarded benefits effective February 1, 2009" and that the "only issue left for the Court to decide is whether [Plaintiff] should be paid benefits from the date of the Application on June 5, 2008 to the date benefits were allowed effective February 1, 2009."  (Tr. 211).  Plaintiff's attorney indicated that he had been authorized to withdraw Plaintiff's appeal as he did not want "to pursue the appeal for the seven (7) months of benefits between June 5, 2008 and February 1, 2009."  (*Id.*).  It appears, however, that Plaintiff did not withdraw his appeal, as his mother did in fact appear for the administrative hearing on November 17, 2010.  Because neither Plaintiff nor the Commissioner has argued that this case should be evaluated as one for a closed period of benefits, the court will not do so.

[3] On August 20, 2012, the Appeals Council had granted Plaintiff an additional thirty (30) days within which to file a civil action.  (Tr. 1-2).

since birth. (Tr. 179). Ms. Kirksey indicated that Plaintiff had been treated at Children's Hospital of Michigan. (Tr. 180). At the time of the report, Plaintiff apparently was not taking any medication and had not undergone any tests. (Tr. 180-81).

In a February 25, 2010 function report, Ms. Kirksey indicated that Plaintiff had problems seeing and that he "walks into things like walls that should be visible to him." (Tr. 225). He also had difficulty talking and could utter only simple words or two-word phrases. (Tr. 226). However, his speech could be understood by people who knew him well most of the time. (*Id.*). He had difficulty following simple commands, such as "bring me your shoe" or "put the toys in the box." (Tr. 227). Because his "balance is off," he bumped into things frequently. (Tr. 228).

In a disability appeals report dated November 15, 2008, Ms. Kirksey reported that Plaintiff's condition had not changed since the time of his last report. (Tr. 192).

### 2.   *The Administrative Hearing*

At the time of the November 17, 2010 hearing before the ALJ, Plaintiff was approximately 2 ½ years old. (Tr. 37). When Ms. Kirksey, Plaintiff's mother, was asked what Plaintiff's "biggest problems" were, she said his "balance" and his "breathing" (he wheezes and coughs, due to asthma). (Tr. 46). She testified that Plaintiff has had mucous dripping from his nose (like a "running faucet") since birth. (Tr. 47). The Friday before the hearing, Plaintiff had had surgery to remove his tonsils and adenoids in the hope that that would relieve some of his sinus congestion. (Tr. 38). Plaintiff's mother, Ms. Kirksey, testified that Plaintiff wore a helmet in order to prevent him from bumping his head. (Tr. 43). She indicated that his "balance is off" and, as a result, he falls multiple times a day. (Tr. 43, 50).

In addition, the helmet is designed to protect Plaintiff's head when he has seizures. (Tr. 43). During these seizures, Plaintiff begins to gag and cough and choke; his eyes bulge; his body

3

stiffens and twitches; and he has a "tremor."  (Tr. 48).  Plaintiff's seizures used to occur "every month," but now that his seizure medication has been increased, they have "slowed down."  (*Id.*).  As far as Plaintiff's heart defects, Ms. Kirksey testified that she had been warned by Plaintiff's physicians that surgery might ultimately be necessary, depending on whether his symptoms worsen.  (*Id.*).  Plaintiff was taking medication for his seizures and asthma, which made him "groggy" and irritable.  (Tr. 45-46).

Ms. Kirksey also testified that Plaintiff's development was delayed; he did not start walking until 20 months and did not start talking until 22 months.  (Tr. 44).  At the time of the hearing, Plaintiff was able to speak, but his speech was "more gibberish than clear."  (Tr. 44).  His mother has difficulty understanding most of what he says.  (Tr. 49).  In addition, Ms. Kirksey testified that Plaintiff was receiving "early intervention" services; specifically, once a week, a therapist came to Plaintiff's house to work with him on different activities designed to strengthen his physical and cognitive development.  (Tr. 43-44).

### 3.    *Medical Evidence*

The medical evidence establishes that Plaintiff has a history of congenital heart disease. An April 8, 2008 echocardiogram performed at Children's Hospital of Michigan ("CHM") reveals that Plaintiff has an atrial septal defect, a ventricular septal defect, and patent ductus arteriosus.  (Tr. 276).  Follow-up echocardiograms performed in May 2008, June 2009, and June 2010 confirmed the continued existence of these conditions.  (Tr. 279-80, 338-42).

On May 2, 2008, Plaintiff saw Dr. Sanjeev Aggarwal in the Pediatric Cardiology Clinic at CHM.  (Tr. 289-91).  Ms. Kirksey reported that Plaintiff was "doing fine" from a cardiovascular standpoint.  (Tr. 289).  After examining Plaintiff, Dr. Aggarwal concluded that he was "clinically very stable" and did not need medication at that time.  (Tr. 291).

On May 22, 2008, Plaintiff returned to CHM's Pediatric Cardiology Clinic, where he saw Dr. Pooja Gupta.  (Tr. 286-88).  Dr. Gupta noted that Plaintiff was "growing well and mildly symptomatic."  (Tr. 287).  Plaintiff was started on diuretics, but Dr. Gupta told Ms. Kirksey that he did not think Plaintiff would need surgery in the near future.  (Tr. 288).

Plaintiff next saw Dr. Gupta in the Pediatric Cardiology Clinic on September 4, 2008. (Tr. 335-37).  At the time, Plaintiff was five months old and had been "doing well" since his last cardiology visit.  (Tr. 335).  He was "growing well and completely asymptomatic at [that] point." (Tr. 337).  Dr. Gupta noted that Plaintiff's ventricular septal defect, which was moderate in size at the last visit, had gotten smaller over time, and he did not believe surgical intervention would be necessary.  (*Id.*).  The diuretics were discontinued, and Plaintiff was advised to follow up in six months.  (*Id.*).

On September 3, 2008, a Childhood Disability Evaluation form was completed by state agency medical consultant Dr. Muhammad Ahmed.  (Tr. 293-98).  Dr. Ahmed concluded that Plaintiff has a "less than marked" limitation in health and physical well-being and "no limitation" in the remaining domains.  (Tr. 295-96).

Plaintiff returned to see Dr. Gupta on June 4, 2009.  (Tr. 331-33).  At that time, Ms. Kirksey reported that Plaintiff had experienced no issues with feeding or fast breathing and had been gaining weight appropriately.  (Tr. 331).  His heart rate, respiratory rate, and oxygen saturation were all normal.  (Tr. 332).  Again, he was considered "completely asymptomatic from a cardiac standpoint."  (Tr. 333).  He did not require any further intervention and was advised to follow-up in one year.  (*Id.*).

In addition to his cardiac conditions, Plaintiff was diagnosed with complex partial epilepsy, with seizure onset in December 2008.  (Tr. 359-60).  At an initial visit to CHM's

Neurology and Developmental Pediatrics Clinic in August 2009, Plaintiff's seizures were described as brief and infrequent, and he was not started on medication. (*Id.*). Plaintiff returned to this clinic on January 27, 2010, at which time it was noted that he recently had experienced another seizure and he was continued on Trileptal "at the current dose."[4] (Tr. 357-58). At a clinic visit in July 2010, Ms. Kirksey reported that Plaintiff had experienced one daytime seizure (and two possible nighttime seizures) since January 2010. (Tr. 354). During the daytime seizure, Plaintiff's eyes became "bugged out," he had a panicked look on his face, and he repeatedly grabbed at his head. (*Id.*). During the nighttime episodes, he was coughing, choking, and vomiting; his eyes rolled back in his head; and he experienced body stiffness and fatigue the following day. (Tr. 354-55). Plaintiff's Trileptal dose was increased, and a sleep study was recommended (because of the reported snoring, choking, and gagging during sleep).[5] (Tr. 355).

In June 2009, Ms. Kirksey voiced suspicions that Plaintiff was developmentally delayed by approximately 5-6 months. (Tr. 331). By then, Plaintiff had had an assessment which confirmed such a delay, and he was receiving home occupational therapy services. (Tr. 311-13). At a neurology visit in July of 2010, it was noted that Plaintiff was "making slow progress in his development," but he "did meet his goals this year." (Tr. 355).

Plaintiff was seen in CHM's Emergency Department on several occasions, primarily for rapid breathing, difficulty breathing, and gagging and choking with feeds, but he was never admitted to the hospital. (Tr. 282-85, 343-45). Generally speaking, these episodes were

---

[4] Thus, at some point between August 2009 and January 2010, Plaintiff apparently began taking medication for seizures.

[5] The results of this sleep study, performed on July 27, 2010, showed that Plaintiff suffers from obstructive sleep apnea with REM exacerbation. (Tr. 308). It was recommended that he follow up with an ENT evaluation for potential upper airway surgery. (*Id.*). As set forth above, Plaintiff apparently had surgery to remove his tonsils and adenoids just days before the hearing. (Tr. 38).

6

considered asthma exacerbation, and Plaintiff was discharged home after treatment.   In September 2010, Plaintiff was seen in CHM's Allergy Clinic for an initial consultation regarding asthma and possible allergic rhinitis, with episodes of coughing, wheezing, and difficulty breathing relieved by albuterol.  (Tr. 371-73).  Plaintiff had never required hospitalization for asthma or associated symptoms, but he did need oral steroids during emergency room visits on two occasions.  (Tr. 372).  Plaintiff was diagnosed with moderate persistent asthma, allergic rhinitis, and obstructive sleep apnea with possible gastroesophageal reflux disease.  (Tr. 372-73).  He was prescribed Pulmicort and was told to continue using albuterol as needed.  (Tr. 373).

Plaintiff's treating physician, Dr. Jin Woo Yoo, filled out several forms regarding Plaintiff's medical condition.  On May 4, 2009, Dr. Yoo completed a State of Michigan Medical Needs form, in which he indicated that Plaintiff required special transportation ("van with lift") and could not attend a childcare center until further notice.  (Tr. 302).  On November 2, 2010, Dr. Yoo completed a "Verification of Disability and/or Special Medical Needs" form for the Michigan State Housing Development Authority, indicating that Plaintiff was "permanently disabled" and required a separate sleeping room, a part-time aide (on a permanent basis), and a live-in aide (on a permanent basis).  (Tr. 309-10).  In further explanation, Dr. Yoo said, "Patient has asthma, seizure disorder, congenital heart disease therefore need round the clock care."  (Tr. 310).  Dr. Yoo also completed a Medical Source Statement on November 10, 2010, in which he opined that Plaintiff has a marked limitation in health and physical well-being, but no other limitations.  (Tr. 394-96).

Plaintiff's treating neurologist, Dr. Sivaswamy, also completed a Medical Statement on November 18, 2010.  (Tr. 397-98).  In that statement, Dr. Sivaswamy indicated that Plaintiff

suffers from partial epilepsy and global developmental delay, which cause a moderate limitation in attending and completing tasks and marked limitations in the other five domains.  (*Id.*).

###    C.    Framework for Child Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(C)(i).  The Social Security regulations set forth a sequential three-step process for determining children's disability claims:  first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *See* 20 C.F.R. §416.924(a).

To "meet" a listed impairment, a child must demonstrate both the "A" and "B" criteria of the impairment.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children."  *Id.*  Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the listing.  *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment does not "meet" a listed impairment, the impairment may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment.  *See* 20 C.F.R. §416.926a.  "Medical equivalency is covered by 20 C.F.R. §416.926; functional equivalency is covered by Section 416.926a."  *Vansickle v. Comm'r of Soc. Sec.*, 277

F. Supp. 2d 727, 729 (E.D. Mich. 2003).

"To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. §416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Evans ex rel. DCB v. Comm'r of Soc. Sec.*, 2012 WL 3112415, at *6 (E.D. Mich. Mar. 21, 2012) (quoting *Koepp v. Astrue*, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011)); *see also* 20 C.F.R. §416.926. "The essence of these subsections is that strict conformity with the Listing Requirements is not necessarily required for a finding of disability. If a plaintiff is only able to demonstrate most of the requirements for a Listing or if he or she is able to demonstrate analogous or similar impairments to the impairments of a Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show impairments of equal medical significance." *Evans*, 2012 WL 3112415, at *7 (quoting *Emeonye v. Astrue*, 2008 WL 1990822, at *4 (N.D. Cal. May 5, 2008)).

Regarding functional equivalence, there are six "domains" that an ALJ considers: (1)

acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *See* 20 C.F.R. §416.926a. Functional equivalence to a listed impairment exists when the child has an "extreme" limitation in one of the six domains or "marked" limitations in two of the six. *See* 20 C.F.R. §416.926a(d). An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. §416.926a(e)(3)(i). A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. §416.926a(e)(2)(i).

### D.      The ALJ's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since June 5, 2008, the application date. (Tr. 20). At step two, the ALJ found that Plaintiff has the following severe impairments: atrial septal defect, ventricular septal defect, patent ductus arteriosus, bronchial asthma, and a seizure disorder. (*Id.*). At step three, the ALJ concluded that these impairments do not meet or medically equal a listed impairment. (*Id.*). The ALJ also found that Plaintiff's impairments do not functionally equal any listing because he has a marked limitation in the domain of "health and physical well-being," less than marked limitations in the domains of "interacting and relating with others," "moving about and manipulating objects," and "caring for himself," and no limitations in the remaining domains. (Tr. 23-29).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision

11

every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

F.   **Analysis**

1.   *The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physicians*

In his motion for summary judgment, Plaintiff primarily argues that the ALJ should have given greater weight to the opinions of his treating physicians, Dr. Yoo and Dr. Sivaswamy. (Doc. #14 at 11-13, 15-19).  A review of the record, however, reveals that the ALJ's evaluation of these opinions, and his subsequent conclusions, are supported by substantial evidence.

An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted).  While treating source opinions are entitled to controlling weight under those circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").   If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the

12

nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §416.927(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion).

As an initial matter, Plaintiff appears to argue that the ALJ should have given controlling weight to Dr. Yoo's opinion, contained in a Michigan State Housing Development Authority form dated November 2, 2010, that Plaintiff is "permanently disabled." (Doc. #14 at 12). As the Commissioner persuasively argues, however, the ALJ was not required to credit Dr. Yoo's opinion in this respect because it is not a "medical opinion," but, rather, a legal opinion on an issue reserved to the Commissioner. (Doc. #16 at 10-11 (citing *Soc. Sec. Rul.* 96-5p, 1996 WL 374183, at *2 (July 2, 1996) and 20 C.F.R. §416.927(d)(1)). Thus, to the extent Dr. Yoo opined that Plaintiff was "permanently disabled," the ALJ was not required to credit that opinion.

Moreover, the ALJ did, in fact, credit Dr. Yoo's medical opinion – contained in the November 10, 2010 Medical Source Statement – that Plaintiff has a "marked" limitation in the domain of health and physical well-being. (Tr. 28, 394-96). Dr. Yoo did not indicate whether Plaintiff had any functional limitations in the other five domains. (Tr. 394-96). Based on Dr. Yoo's opinion and treatment notes,[6] the ALJ reasonably concluded that Plaintiff has a marked limitation in health and physical well-being. (Tr. 23, 28). Plaintiff has simply failed to show any inconsistency between Dr. Yoo's opinion – as set forth in the Medical Source Statement – and

---

[6] To the extent that Dr. Yoo's treatment notes reflect serious medical conditions and functional limitations, the ALJ credited those findings. For example, the ALJ adopted Dr. Yoo's clinical diagnoses by finding that Plaintiff's severe impairments include an atrial septal defect, a ventricular septal defect, patent ductus arteriosus, bronchial asthma, and a seizure disorder. (Tr. 20, 302, 310, 394).

the ALJ's findings.  Therefore, even if Plaintiff was correct in his assertion that the ALJ failed to specifically articulate the amount of weight given to Dr. Yoo's opinion, as well as provide good reasons for giving his opinion less than controlling weight, any error in this respect is harmless under the circumstances.  (Doc. #12 at 15).  *See Wilson*, 378 F.3d at 547 ("… if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant").

Plaintiff also argues that the ALJ erred when he "summarily rejected" the opinion of Dr. Sivaswamy, Plaintiff's treating neurologist, that Plaintiff's epilepsy and cognitive delay cause a "moderate" limitation in attending and completing tasks and "marked" limitations in the remaining five functional domains.  (Doc. #12 at 16; Tr. 397-98).  Contrary to Plaintiff's argument, however, the ALJ provided good reasons for giving Dr. Sivaswamy's opinion "little weight," explaining that it was "inconsistent with the claimant's treatment record."  (Tr. 23).  A review of Dr. Sivaswamy's treatment notes, as well as other evidence in the record, reveals that the ALJ's conclusion in this respect is supported by substantial evidence.

As the Commissioner correctly points out, Dr. Sivaswamy primarily assessed Plaintiff's physical health concerns, with very little evaluation of his limitations in the other five functional domains.  (Tr. 354-61).  Dr. Sivaswamy evaluated Plaintiff's reflexes, eye contact, vision, muscle tone, diet, and sleep pattern.  (Tr. 355, 358, 360).  To the extent that Dr. Sivaswamy assessed Plaintiff's development, she noted that he was "making slow progress" but that he "did meet his goals this year" and will "progress to a center based [Early On] program in the fall.  (Tr. 355).  At an August 2009 visit, Dr. Sivaswamy noted that Plaintiff could wave good-bye, play pat-a-cake and peek-a-boo, and speak some words.  (Tr. 360).  At a January 2010 visit, Dr.

14

Sivaswamy noted that Plaintiff was "playful and interactive," with "good eye contact." (Tr. 358). Thus, Dr. Sivaswamy's opinion that Plaintiff is markedly limited in five of the six functional domains is simply not supported by her own treatment notes.

In addition, Dr. Sivaswamy's opinion that Plaintiff is markedly limited in acquiring and using information runs contrary to the Function Report completed by Ms. Kirksey, who indicated that Plaintiff, at less than two years of age, could say simple words and phrases and that his speech could be understood by people who know him well most of the time. (Tr. 226). Ms. Kirksey also indicated that Plaintiff could follow simple, one-step directions and could use words to ask for toys, food, or people. (Tr. 227). Similarly, Dr. Sivaswamy's opinion that Plaintiff is markedly limited in interacting and relating with others is contradicted by Ms. Kirksey's statement that Plaintiff's impairments do not affect his behavior with other people. (Tr. 229). With respect to moving about and manipulating objects, Dr. Sivaswamy's opinion that Plaintiff is markedly limited in this domain also is inconsistent with Ms. Kirksey's statements – and the ALJ's findings – that Plaintiff could crawl, stand with or without help, walk, climb onto furniture, throw a ball or other object, dance or jump up and down, run, stack small blocks up to 6 blocks high, push and pull small toys, and scribble with a crayon or pencil. (Tr. 27, 235). Thus, while Plaintiff's treatment records demonstrate the presence of severe impairments, they do not support the marked restrictions found by Dr. Sivaswamy.

Finally, the basis of Dr. Sivaswamy's opinion is unclear because she failed to provide any explanation or support for her conclusory opinion that Plaintiff is markedly limited in five domains and moderately limited in another. (Tr. 396-98). A treating physician's opinion must be supported by the record. *See* 20 C.F.R. §416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the

15

more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Thus, because Dr. Sivaswamy failed to set forth specific, objective medical findings to support her opinion regarding Plaintiff's functional limitations, the ALJ did not err in giving her opinion little weight. *See, e.g., Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009); *Curler v. Comm'r of Soc. Sec.*, 2013 WL 1286151, at *2 (E.D. Mich., Mar. 28, 2013).

### 2.    *The ALJ Was Not Required to Obtain a Second Medical Opinion*

Plaintiff next argues that the ALJ erred in failing to "develop a complete administrative record by obtaining a medical opinion regarding medical equivalence." (Doc. #12 at 19). As set forth above, however, the record contains a September 2008 opinion from Muhammad Ahmed, M.D., a state agency physician, who reviewed Plaintiff's medical records and concluded that he has a "less than marked" limitation in health and physical well-being and "no limitation" in the remaining domains. (Tr. 293-98). Plaintiff argues that the ALJ should have obtained an updated medical opinion because he submitted "extensive medical records" after Dr. Ahmed rendered his opinion. (Doc. #14 at 20). He then conclusorily asserts that if this had been done, "medical equivalence would have been found and the Plaintiff would have been found disabled." (*Id.*).

In support of this argument, Plaintiff cites to section I-5-4-30 of the Social Security Administration Office of Disability Adjudication and Review's Hearings, Appeals and Litigation Law Manual ("HALLEX"). (*Id.*). However, that section merely provides that an ALJ must "obtain opinions on <u>medical</u> equivalence from medical experts." HALLEX I-5-4-30 (emphasis in original). Here, the ALJ did just that by obtaining the opinion of Dr. Ahmed. Plaintiff's unsupported assumption that a second medical opinion would have reached a different conclusion on the issue of medical equivalence is not a basis for remand. As the Commissioner correctly notes, "An ALJ has discretion to determine whether further evidence, such as

16

additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).  Here, where the record contains an expert opinion regarding medical equivalence, as well as substantial other medical evidence in the record supporting his findings, the ALJ had no obligation to seek an additional opinion.

### 3.    The ALJ Properly Evaluated Whether Plaintiff Has Severe Impairments

Plaintiff also argues – somewhat confusingly – that the ALJ "failed to assess and explain" his "Seizure Disorder and Obstructive Lung Disease/Obstructive Sleep Apnea" when evaluating his severe impairments.  (Doc. #14 at 21).  In reality, the ALJ did find Plaintiff's seizure disorder to be a severe impairment.  (Tr. 20).  Similarly, with respect to Plaintiff's breathing and lung difficulties, the ALJ found that Plaintiff's bronchial asthma is a severe impairment.  (*Id.*).  Contrary to the implication of Plaintiffs' argument, the ALJ's discussion of those matters did not end there.  Rather, he went on to discuss Plaintiff's seizures, noting that "[i]n July 2010, [Kirksey] reported that [Plaintiff] had only had one daytime seizure and two at night since he was last seen in January 2010, and his asthma, noting that he "never required hospitalization for asthma … but has required oral steroids during emergency room visits on two occasions."  (Tr. 22).  Finally, referencing 20 C.F.R. §416.926a(l)(3) and SSR 09-8p, and numerous conditions identified therein, including "seizure or convulsive activity," the ALJ concluded that Plaintiff "continues to require treatment for asthma," and that therefore, in the domain of Health and Physical Well Being, Plaintiff had marked limitations.  (Tr. 28).  Together, the foregoing shows that Plaintiff's argument lacks merit.

Plaintiff's argument with respect to his obstructive sleep apnea is also unavailing.  The record simply does not demonstrate that this condition is a severe impairment.  The applicable regulations provide that an impairment is not severe if it is "a slight abnormality … that causes no more than minimal functional limitations …."  20 C.F.R. §416.924(c).  As the Sixth Circuit

has recognized, the mere existence of an underlying condition does not establish that the claimant has a severe impairment. *See Despins v. Commissioner of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007). In this case, Plaintiff's sleep apnea diagnosis was isolated (Tr. 308), and there is no indication that it causes any limitation in his ability to function.[7] Accordingly, the ALJ did not err in omitting this condition from Plaintiff's list of severe impairments.[8]

### 4.   The ALJ Did Not Err in Refusing to Consider Color Photos of Plaintiff

Lastly, Plaintiff argues that the ALJ erred in refusing to review, consider, and/or admit into evidence color photos of Plaintiff that his attorney attempted to provide at the administrative hearing. (Doc. #14 at 24). Plaintiff asserts that these photos show that he has "extensive nasal congestion." (*Id.*). This argument is with merit.

First, Plaintiff previously provided black and white photos of the same nature to the ALJ, which are included in the record (Tr. 375-76), and he has failed to explain how the color photos are demonstrably more informative than those photos. Moreover, Ms. Kirksey testified at the hearing that the photos show mucous below Plaintiff's nose that "has been running since birth." (Tr. 47). Thus, the ALJ certainly was aware of what the proffered photos depicted.

---

[7] Indeed, Plaintiff has not identified which, if any, of the six functional domains would be affected if his sleep apnea was considered a severe impairment.

[8] Plaintiff also argues in passing that "the ALF [sic] found the Plaintiff's cardiovascular impairment had improved and was 'asymptomatic' but the ALJ failed in the Decision to assess the Medical Improvement Standard." (Doc. #14 at 21). As an initial matter, Plaintiff failed entirely to elaborate on this argument and, therefore, has waived the issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones."). Moreover, even if Plaintiff had better developed this argument, it is meritless, as "medical improvement" is defined in the applicable regulations as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continue to be disabled." 20 C.F.R. §404.1594(b)(1). Here, where Plaintiff was not previously adjudged disabled, the medical improvement standard does not apply.

More importantly, the ALJ indicated at the hearing that he typically does not rely on photos – or even on a claimant's appearance in the hearing room – because "[t]hings that look bad could be benign, and things that don't look at all bad could be very serious.  So I tend to rely mostly on the medical records."  (Tr. 38).

The Court finds the ALJ's approach and reasoning to be sound, both in general, and in this case.  The proffered photographs are not medical evidence because they were not provided by a medical source.  While Plaintiff cites extensively to portions of 20 C.F.R. 404, Subpart H, which provide "basic rules about what evidence is needed when a person claims [] disability …." (§§404.702 (definition of "evidence") and 404.709 ("preferred" and "other" evidence)), 20 C.F.R. §404.950 (presenting evidence at a hearing before the ALJ), and to the HALLEX, none of those constitute authority for the proposition that the ALJ was required to consider and/or admit into evidence the proffered color photographs.[9]

---

[9] In fact, to the extent the most detailed of those regulations, §404.709, is applicable, it belies Plaintiff's argument.  It provides, in relevant part, "…unless we have information in our records that raises a doubt about the evidence, other evidence of the same fact will not be needed."  20 C.F.R. §404.709.  As discussed above, the ALJ appropriately considered the relevant medical evidence, and had the added evidentiary benefit of the black and white photographs which were part of the record before him.  (Tr. 375-76).  Thus, the cited regulation does not support Plaintiff's argument.  Moreover, §404.709 does not seem applicable here.  §404.709 clarifies that it applies to the type of "preferred" evidence discussed in Sections 404.715-780.  *Id.*  But, none of those sections pertain to disability benefit claims.  Rather, as noted in Subpart H's introductory statement, "there are special evidence requirements for disability benefits.  These are contained in subpart P."  20 C.F.R. §404.701 – Introduction.  Plaintiff makes no argument with respect to Subpart P, and has therefore waived the issue.  *See McPherson*, 125 F.3d at 995-96.  At any rate, a review of Subpart P shows that the ALJ did not err in failing to consider the color photographs proffered by Plaintiff.  *See, e.g.*, 20 C.F.R. §404.1508 – "What is Needed to Show an Impairment" for disability benefits ("A physical or mental impairment must be established by medical evidence…"); §1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is…"); §1513(d) ("In addition to evidence from the acceptable medical sources [] we *may* also use evidence from other sources…") (emphasis added).  Nothing contained in Subpart P required the ALJ to consider the proffered color photographs, and he had before him more than enough medical and other evidence on which to base his decision.

In sum, Plaintiff offers no valid argument as to why the proffered color photographs would not be merely cumulative of the evidence already before the ALJ, or why the ALJ's consideration of them would have resulted in a different outcome.  While the Court does not find any error with respect to the ALJ's handling of the proffered color photographs, even if one assumed that he should have received them into evidence and considered them, Plaintiff has shown at most a harmless error.  Thus, this argument fails.

## III. CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **[16]** be **GRANTED**, Plaintiff's Motion for Summary Judgment **[14]** be **DENIED**, and the ALJ's decision be **AFFIRMED**.


Dated: July 2, 2013                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge

20

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 2, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

21